**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ALESIA GONZALEZ,

       *Plaintiff,*

v.                                                          No. CIV 20-0421 RB/SMV

IMTT EPIC LLC,

       *Defendant.*

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant IMTT Epic LLC (IMTT) owns and operates a fuel supply facility. In May 2016, Plaintiff Alesia Gonzalez noticed the smell of jet fuel coming from the water in her kitchen sink. She called the New Mexico Environment Department (NMED), which in turn contacted IMTT's predecessor's environmental consultant (GHD). Water sample testing revealed that the levels of naphthalene exceeded water quality standards. Gonzalez filed suit in 2020 for negligence and trespass. The deadline to amend pleadings has passed, and discovery has closed. Gonzalez now moves to amend her complaint to add a claim for punitive damages. IMTT opposes the motion. It also moves for summary judgment on the issue of punitive damages. As discussed below, the Court will deny the motion to amend and deny the motion for summary judgment as moot.

**I.     Statement of Facts**

"IMTT owns and operates a facility located in Otero County, New Mexico (Facility) that provides jet fuel to Department of Defense facilities, including Holloman Air Force Base." (Doc. 57 Undisputed Material Fact (UMF) ¶ 1 (citing Doc. 57-A at 2[1]).) "IMTT acquired the Facility from its previous owner on August 8, 2017." (*Id.* UMF ¶ 2 (citing Doc. 57-B at 7).) The Facility

---

[1] The Court cites to the CM/ECF page numbers of Exhibits A and B, rather than to the exhibits' internal page numbers.

"was constructed in 1965." (Doc. 57-A at 2.) Historical records show that in 1967 or 1968, approximately 16,000 gallons of jet fuel were inadvertently released. (*Id.*) "Assessment and remediation efforts have been ongoing . . . since 1981." (*Id.*) "The environmental consulting firm GHD has performed assessment and remediation [for the Facility] since 2015." (Doc. 57 UMF ¶ 4 (citing Doc. 57-C at 11:9–11); *see also* Doc. 57-A at 3.)

Gonzalez "owns property located to the south of the Facility." (Doc. 57 UMF ¶ 5 (citing Doc. 57-A at 4); *see also* Doc. 57-A at 3.) She used water from a well that she dug on her property in 1984. (Doc. 57-D at 20:20–21; *see also* Doc. 1 (Compl.) at 3.) In early May 2016, Gonzalez noticed that the water coming from her kitchen sink carried an odor of jet fuel. (Doc. 57-D at 27:3–8.) She called the NMED and spoke to NMED representative Ray Montez. (*Id.* at 35:11–15; *see also* Compl. at 2.) Montez contacted GHD on May 9, 2016, with information about Gonzalez's report. (Docs. 57-E at 23:1–7; 57-A at 3.) On May 11, 2016, Montez and representatives from GHD and the Facility came to Gonzalez's property and took water samples. (*See* Docs. 57-A at 3; 57-D at 35:11–18.) "The water samples were analyzed on a 24-hour rush turnaround time and analyzed for [benzene, toluene, ethylbenzene, and total xylenes (BTEX)] and naphthalenes[2] . . . ." (Doc. 57-A at 3; *see also* Doc. 57-E at 23:15–21.) The results showed that the naphthalene levels exceeded the applicable state standards. (*See* Docs. 57-A at 3; 61-A at 2.)

To filter the contamination out of the well water, "GHD had a point of entry treatment (POET) system installed on [Gonzalez's] property on May 24, 2016." (Docs. 57 UMF ¶ 12 (citing Doc. 57-A at 3); 57-E at 25:23–26:7.) Justin Ball, an environmental scientist supervisor for NMED who is involved in overseeing abatement of the 1967 fuel spill at the Facility, testified that

---

[2] "Naphthalene is made from crude oil or coal tar" and "is possibly carcinogenic to humans." *See Naphthalene*, National Pesticide Information Center, http://npic.orst.edu/factsheets/naphgen.html (reviewed Dec. 2010).

installing the POET system was "an appropriate response" to Gonzalez's complaint. (Doc. 57-E at 6:14–15, 15:9–15, 25:14–17.) With the exception of two months (January and February 2017), monthly tests performed on the treated well water from June 2016 through June 2017 showed that naphthalene levels were acceptable. (*See id.* at 25:1–5; Docs. 57-A at 5; 57-F at 23:3–24:4; 60-D at 19:9–20:18.) Ball testified that the POET system was treating the water as required. (Doc. 57-E at 29:13–17.) Gonzalez has not filed any formal complaints with the NMED concerning her water after May 2016. (*See id.* at 32:9–20; Doc. 57-D at 74:15–24.)

In June 2017, Gonzalez's property was hooked up to the residential public water system known as the Boles Water System. (Docs. 57-E at 30:19–22; 57-A at 3.) "IMTT and its predecessor have paid" for Gonzalez to use the Boles Water System since June 2017. (Doc. 57-D at 74:8–14.) Monthly testing of this water system returns results within acceptable standards. (Doc. 57-E at 30:23–32:4.) Monthly testing of Gonzalez's well water ended after she went on the Boles Water System. (*See, e.g.*, Doc. 57-A at 5.)

NMED has not "complain[ed] about GHD or IMTT's actions in responding to . . . Gonzalez'[s] 2016 complaints about her water[,]" and GHD and IMTT have "done everything that NMED has asked them to do regarding [the] water complaint[.]" (Doc. 57-E at 32:21–33:4.)

Gonzalez filed her complaint in this Court on May 3, 2020, asserting claims for negligence and trespass. (Doc. 1.) In the Scheduling Order entered September 17, 2020, the Court set a deadline of October 29, 2020, for Gonzalez to move to amend her complaint. (Doc. 23 at 2.) Discovery closed on March 16, 2021. (*See id.*) Gonzalez moved to amend her complaint to add a claim for punitive damages on April 15, 2021. (Doc. 56.) IMTT moved for summary judgment on the proposed punitive damages claim on the same day. (Doc. 57.)

## II.     Legal Standards

### A.      Standard for Motions to Amend

Rule 15 allows a party to amend its pleading once as a matter of course in limited circumstances. Fed. R. Civ. P. 15(a)(1). Otherwise, a party may only amend its pleading with the "opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 directs that leave shall be freely given "when justice so requires." *Id.* "The purpose of the Rule is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quotation omitted). A court may deny a motion for leave to amend where there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. . . ." *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"When the deadline for amending pleadings set in the scheduling order has passed, . . . Federal Rule of Civil Procedure 16(b)(4) is also implicated." *Soseeah v. Sentry Ins.*, No. CV 12-01091 RB/GBW, 2014 WL 12796813, at *1 (D.N.M. Apr. 18, 2014). "Rule 16(b)(4) provides that a scheduling order 'may be modified only for good cause and with the judge's consent.'" *Id.* (quoting Fed. R. Civ. P. 16(b)(4)). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (quotation omitted)).

### B.      Standard for Motions for Summary Judgment

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### C. Relevant Local Rules

Pursuant to Local Rule 56, the party moving for summary judgment "must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to those portions of the record upon which the movant relies." *Id.* In return, the non-moving party must also provide "a concise statement of the material facts . . . as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id.* "**All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.**" *Id.* (emphasis

5

added). "The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion." *Id.*

Gonzalez fails to follow Local Rule 56 in her response to IMTT's motion for summary judgment. (*See* Doc. 61.) She fails to address any of IMTT's facts and only presents a handful of her own, none of which are lettered in accordance with Local Rule 56.1(b). To the extent that Gonzalez's facts rebut IMTT's, the Court considers them appropriately. Otherwise, where Gonzalez fails to specifically controvert IMTT's facts, the Court deems those facts undisputed and considers the evidence to be part of the record.

### III. The Court will deny Gonzalez's motion to amend.

Gonzalez asserts that she should be allowed to amend her complaint to add a claim for punitive damages, because the amendment is based on evidence she learned late in discovery. (*See* Doc. 56.) IMTT opposes the amendment and argues that the motion is untimely, Gonzalez had prior notice of the evidence, and there is no evidence to support an award of punitive damages. (*See* Doc. 60.)

#### A. Gonzalez fails to show good cause to amend under Rule 16(b)(4).

The deadline to amend pleadings has passed; thus, Gonzalez must show that she was unable to meet that deadline despite her diligent efforts. *See Gorsuch*, 771 F.3d at 1240. This standard "may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.* (citation omitted). "If [she] knew of the underlying conduct but simply failed to raise [the] claims, however, the claims are barred." *Id.* (citations omitted).

The parties fail to discuss whether Gonzalez has shown good cause to amend under Rule 16. (*See* Docs. 56; 60; 65.) Gonzalez primarily argues that she should be allowed the late amendment because it is based on evidence that was unavailable to her until late in discovery. (*See*

Doc. 56.) She discusses two pieces of evidence: (1) deposition testimony regarding water samples from January and February 2017; and (2) deposition testimony regarding when IMTT knew it was contaminating Gonzalez's neighborhood. (*Id.* at 2–3.)

> **1.    Gonzalez had notice of monthly water sample analyses prior to filing this lawsuit or by August 2020 at the latest.**

Gonzalez first asserts that IMTT "misrepresented the extent to which it contaminated [her] property." (*Id.* at 2.) This allegation relates to information regarding monthly water sample testing performed from June 2016 through June 2017. In January and February 2017, naphthalene levels exceeded quality standards. (*See*, *e.g.*, Doc. 60-D at 19:9–21:19.) Gonzalez argues that she only learned about the January and February 2017 numbers during the March 15, 2021 deposition of a GHD employee. (Doc. 56 at 2.)

In response, IMTT submits the relevant deposition testimony from GHD employee Mathews. (*See* Doc. 60-D.) On March 15, 2021, Mathews testified that the 2017 annual report inaccurately listed naphthalene levels on Gonzalez's property for January and February 2017 as falling within an acceptable range. (*See* Doc. 60-D at 19:9–20:6.) There were three naphthalene-related values that should have been added together to provide a total level that exceeded the acceptable standard for those two months. (*See id.*) Mathews knew this by looking at the analytical reports attached to the annual report. (*Id.* at 20:15–25.) She testified that GHD provided the reports with the correct information to NMED, the public, and directly to Gonzalez at that time. (*Id.* at 21:1–19.) Mathews averred that GHD sent letters directly to Gonzalez, and the January and February 2017 letters would have "state[d] that naphthalene was in exceedance." (*Id.* at 21:11–19.)

IMTT also submitted testimony from Gonzalez acknowledging that GHD sent her test

results from monthly water sample analyses performed on her property. (*See* Doc. 60-E at 54:23–55:11.) Gonzalez testified that she read the reports each month. (*See id.* at 55:14–56:13.) IMTT argues that Gonzalez had this information well before she filed the lawsuit. (*See* Doc. 60 at 11–12.) Even if she had been unable to understand the results in 2017, IMTT argues that it disclosed the results to her again on August 8, 2020, as part of discovery. (*Id.* at 12 (citing Doc. 38).) IMTT also submitted testimony from Gonzalez's expert, Erwin Melis, who confirmed that he had received lab results and reports, but he "did not dig into detail as to the lab standards or lab methods and/or the error associated with [the] tests . . . ." (Doc. 60-F at 38:4–9.)

In her reply brief, Gonzalez fails to address Mathews's testimony that GHD sent her the January and February 2017 testing results in 2017. (*See* Doc. 65.) She also fails to explain why Melis did not raise this as an issue after IMTT produced the documents again during discovery in August 2020. (*See id.*) Consequently, Gonzalez has not shown that despite her diligent efforts, she could not meet the October 29, 2020 scheduling deadline. *See Gorsuch*, 771 F.3d at 1240. Moreover, even if Melis did not "dig into" the reports before the deadline for motions to amend, Gonzalez does not explain why she waited until April 15, 2021, to file her motion when she submitted Melis's report on January 15, 2021. (*See* Doc. 38.) By the Court's calculations, Melis analyzed the relevant documents two months before Mathews's deposition and three months before Gonzalez filed her motion to amend. This delay is contrary to a showing of good cause.

In sum, the Court finds that because Gonzalez does not rebut IMTT's assertion that it produced this information by August 2020 at the latest, she fails to show good cause for her late motion to amend based on the January and February 2017 testing results.

### 2.      Gonzalez knew about remediation efforts in her area before 2020.

Gonzalez also contends that until the parties took the deposition of an unnamed NMED

witness in January 2021, she was unaware that IMTT's predecessor "knew it was contaminating [her] neighborhood, but never notified the residents until after [she] complained in 2016." (Doc. 56 at 3.) As IMTT points out, however, allegations in the complaint negate this argument. The Complaint alleges that on May 11, 2016, the day Montez and the other representatives came to take water samples, Gonzalez learned about the 1960s jet fuel spill and the remediation efforts that "began sometime in the 1980s." (Compl. at 4.) Thus, Gonzalez clearly had knowledge about the remediation efforts, as well as the alleged failure to communicate those efforts to the community, as early as 2016.[3]

Gonzalez does not address IMTT's argument regarding her pre-2020 knowledge of these issues. (*See* Doc. 65.) Instead, she simply reiterates that the NMED defendant testified in January 2021 regarding IMTT's "pre-existing knowledge of this contamination . . . ." (*Id.* at 2.) Nor does Gonzalez attempt to explain why she waited three months after that deposition to move to amend her complaint. Under these circumstances, the Court finds that Gonzalez fails to show good cause for the delay in moving to amend. Having found that Gonzalez fails to show good cause for her failure to amend her pleadings within the scheduling order deadline, the Court will deny her motion to amend pursuant to Rule 16(b)(4).

### B.    Gonzalez fails to offer an adequate explanation for her delay under Rule 15.

The Court need not address the Rule 15(a) standard, given its conclusion that Gonzalez has failed to show good cause for her delay under Rule 16(b)(4). *See Gorsuch*, 771 F.3d at 1242. But the Court will also deny the motion to amend pursuant to Rule 15 on the basis that the motion was unduly delayed. "The fact that a motion to amend is filed late does not by itself justify the denial

---

[3] Gonzalez also asserts, without citing relevant authority, that "generally persons who could be affected by contamination should be notified of remediation efforts." (*Id.*) Again, however, she had information regarding a potential claim on this matter when she filed her complaint.

of a motion to amend." *ACC Consultants, Inc. v. Logistics Health, Inc.*, No. CIV. 09-1145 JP/RHS, 2011 WL 5212262, at *5 (D.N.M. Feb. 25, 2011) (citing *Minter*, 451 F.3d at 1205). "However, denial of a motion to amend is appropriate if the movant does not provide an adequate explanation for the delay." *Id.* (citing *Minter*, 451 F.3d at 1206).

As explained above, Gonzalez had all or most of the evidence on which she bases her lawsuit before 2020. Regardless, she received the relevant water sample results no later than August 2020, and her expert rendered his report based on the evidence in January 2021. Coupled with the January 2021 deposition testimony of the NMED witness, it is clear that Gonzalez had all of the evidence on which she bases her claim for punitive damages in January 2021 at the very latest. Yet she fails to explain why she waited three additional months to file her motion to amend. Consequently, the Court will deny the motion to amend based on Gonzalez's undue delay.

**C.    Gonzalez's motion to amend is subject to dismissal on the basis of futility.**

Courts may also deny motions to amend where the amendments would be futile. *See Foman*, 371 U.S. at 182. Although it is unnecessary to analyze the motion for summary judgment because the Court is denying Gonzalez's motion to amend, the parties' briefing on the dispositive motion is helpful in analyzing the viability of the claim. IMTT argues that in New Mexico, "[p]unitive damages may only be awarded when a plaintiff proves that the conduct of the defendant was either malicious, willful, reckless, wanton, fraudulent, or in bad faith." (Doc. 57 at 8 (citing N.M. Civ. UJI 13-1827).) *See also, e.g.*, *Clay v. Ferrellgas, Inc.*, 881 P.2d 11, 14 (N.M. 1994). It further asserts that New Mexico "courts deny punitive damages claims in environmental nuisance cases where (as here) the defendant, upon learning of the problem, promptly takes significant steps to ameliorate the situation and minimize any damage . . . ." (*Id.*) Not only did Gonzalez fail to rebut any of IMTT's factual assertions, but she also failed to respond to IMTT's substantive

arguments. (*See* Doc. 61.)

The New Mexico Supreme Court has held that punitive damages may be awarded if the plaintiff shows that "the defendant acts with 'reckless disregard' for the rights of the plaintiff— i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless 'utterly fail[s] to exercise care' to avoid the harm. *Paiz v. State Farm Fire & Cas. Co.*, 880 P.2d 300, 308 (N.M. 1994). IMTT submitted evidence to show that it acted promptly to address Gonzalez's complaint. NMED employee Ball testified that IMTT (and its predecessor) adequately addressed her 2016 complaint. Gonzalez fails to rebut IMTT's factual assertions or to submit evidence to show that IMTT had a culpable state of mind sufficient to award punitive damages. Thus, Gonzalez fails to demonstrate facts to show there is a genuine issue for trial, and her claim for punitive damages is subject to dismissal for futility.[4] *See, e.g.*, *Gallegos v. Bernalillo Cty. Bd. of Comm'rs*, No. CV 16-0127 JB/WPL, 2017 WL 3575883, at *48 (D.N.M. Aug. 17, 2017) (in deciding motion to amend, court found that plaintiff "neither direct[ed] the Court to record evidence or [made] allegations . . . that controvert[] the record evidence" on the proposed claim; consequently, the amendment was subject to dismissal for futility).

**THEREFORE,**

**IT IS ORDERED** that Gonzalez's Motion for Leave to Amend Complaint to Include Punitive Damages (Doc. 56) is **DENIED**;

**IT IS FURTHER ORDERED** that IMTT's Motion for Partial Summary Judgment (Punitive Damages) (Doc. 57) is **DENIED AS MOOT**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[4] Had the Court granted the motion to amend, it would have granted IMTT's motion for summary judgment on this basis.